1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL L. CHIPMAN,

11              Petitioner,              No. CIV S-04-0712 MCE DAD P

12        vs.

13   DIANA K. BUTLER, Warden, et al.,

14              Respondents.            FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

18   entered against him on May 5, 1999, in the Sacramento County Superior Court on charges of

19   vehicular burglary with three prior serious felony convictions.  He seeks relief on the grounds

20   that: (1) jury instruction error violated his right to due process; (2) juror misconduct violated his

21   right to due process; (3) his sentence, imposed pursuant to California's Three Strikes law,

22   violates the federal constitution; and (4) the cumulative effect of the errors at his trial violated his

23   right to due process.  Upon careful consideration of the record and the applicable law, the

24   undersigned will recommend that petitioner's application for habeas corpus relief be denied.

25   /////

26   /////

PROCEDURAL AND FACTUAL BACKGROUND[1]

A.  Prosecution's Case

At approximately 5:30 p.m. on October 6, 1998, Joan Slabaugh drove her green van to the Tree House Learning Center in Laguna to pick up her daughter.  Joan parked next to a gold-colored Acura, which was on the driver's side of her van.  Defendant, who Joan described as a Black man, was sitting inside the Acura playing loud music.  She exited and locked her van, and set the car alarm. When she returned to the parking lot with her daughter, she saw glass on the ground near her van and the driver's side window of her van smashed.  The Acura was no longer in the parking lot.

Joan immediately telephoned her husband, Robert Slabaugh, a detective with the Citrus Heights Police Department.  He instructed her to wait for him to arrive and told her he would call for a police unit to investigate the matter.

Meanwhile, Jeffrey Beeson, who was seated in his car in the same parking lot of the Learning Center about three spaces to the right of Joan's van, heard a thud that sounded like glass breaking, and then heard a car alarm go off.  After hearing the glass break, Beeson saw a gold-color Acura pull out from the far side of the green van, and noticed that the driver's side window of the van had been broken.  He decided to follow the speeding Acura, which went into a nearby residential area, where Beeson was able to head it off at an intersection.

Beeson stopped defendant and asked him his name and what he was doing at the day care center.  Defendant told him his name was "Mike Douglas" and he was there to pick up his son whose name was "Michael Douglas."  Beeson asked defendant if he had seen the shattered window on the green van, and defendant stated that he had not noticed it.  When asked if he had heard the car alarm, defendant admitted he might have "tapped" the green van with his car as he was pulling out.  When Beeson asked defendant what he was doing in that neighborhood, defendant told him he was going to meet his mother at a friend's house, but did not respond when asked to give the address of the house.  Beeson asked defendant for his telephone number which Beeson wrote down.  After a few minutes, defendant appeared agitated, so Beeson let him go and returned to his own car.  As he followed defendant out of the neighborhood, Beeson wrote down the license plate number of defendant's Acura and later reported that number to a sheriff's deputy.  Beeson later identified defendant from a photo lineup as

---

[1]  The following summary is drawn from the November 28, 2001 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-6, filed in this court as Exhibit A to the Answer.

the person driving the gold-colored Acura and also identified him in court as the same individual.

A record check conducted by Robert Slabaugh on the license plate Beeson reported to the sheriff's department disclosed that the car was registered to defendant and that he was the owner of the car, a 1989 Acura sedan.

Robert Slabaugh conducted surveillance at defendant's house to see if he was there. When he did not see the Acura outside, he waited in his car from a location where he could watch for defendant's return. At approximately 7:15 p.m., his wife Joan paged him. He called her back, and she told him their daughter's blue backpack was missing from the van. Later, Robert drove down Newington Way, a street near the day care center where Beeson had intercepted defendant. He found the backpack and several items that had fallen out of it lying on the ground. Slabaugh took the items, inventoried them, and released them to his wife.

On two separate occasions prior to the burglary of the green van, employees of the Tree House Learning Center saw a black male in a gold-colored Acura. The first incident occurred approximately one week before the burglary when an employee saw the man get out of his car, peek into the window of another car and lift the door handle of that car. After standing beside the car for a brief moment, the man returned to his own car and drove away. The second incident occurred the day before the burglary. At that time, the employee saw the man looking in the window of her own car. As the employee approached her car, the man saw her, turned quickly, got into his car, and drove away. Neither employee of the Learning Center recognized the man as a parent of any of the children that attended the center and no child with the name of Michael Chipman was registered at the center.

B. Defense

Defendant testified in his own behalf. He admitted breaking the window of the green van, but denied taking anything from it. He also denied driving to the day care center the day or the week before the October 6th burglary of the van.

Defendant testified that he drove his Acura to the day care center to meet his former girlfriend Tracy, who was supposed to meet him there. He was angry because he thought she had stood him up. The green van pulled into the space next to him, and the woman driving it looked at him in a "negative way," which he felt was due to her disapproval of his loud music. He testified that he "took it as a negative gesture, and . . . did something stupid. I got out [of] my car, went over to the island, grabbed a rock, threw it and broke her window."

Upon leaving the parking lot, defendant drove into a neighborhood where Beeson waved him down. Defendant admitted that he lied to Beeson and told him that his name was Michael Douglas. When Beeson asked him about the green van, defendant told him he had hit it. At approximately 6 p.m., after finishing his conversation with Beeson, defendant drove to Charles Wade's house to visit his uncle. He stayed about 15 or 20 minutes and when he left the house, he noticed that his car was missing. Defendant walked around his old neighborhood in search of his car. Unable to find it, he walked seven miles to the house of Shirley Dodson, his fiancee, where he found her. They took Dodson's truck to look for defendant's car.

Shirley Dodson testified that she picked up defendant's son, Michael Chipman, Jr., at 10:20 p.m. from defendant's mother's house and drove to the home of defendant's uncle. Upon finding no one home, Dodson drove back towards defendant's home, and on the way, saw a gold-colored Acura like defendant's, being driven in the opposite direction. She was not able to recognize the driver of the car. Dodson returned home where she saw defendant. She told him she had seen his car on the street and the two of them drove her truck to see if they could locate it.[2] The next morning, after they were unable to find defendant's car, defendant told Dodson he was going to report his car missing.

C. Rebuttal

During a post-arrest interview, defendant denied he was at the Tree House Learning Center on October 6, 1998. He also denied being in the Laguna area that night and did not mention anything about meeting a girl named Tracy.

Defendant was charged with vehicular burglary (Pen. Code, § 459),[3] and convicted by jury of that offense. The court found true the three prior serious felony convictions charged in the information under the three strikes law. (§§ 1170.12, 667.5, subds. (b) to (I).) He was sentenced to prison for 25 years to life. He filed a timely notice of appeal.

/////

/////

/////

---

[2] Defendant was reluctant to report his car stolen that night and wanted to look for it first.

[3] All further statutory references are to the Penal Code unless otherwise indicated.

4

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a

5

1   federal habeas court independently reviews the record to determine whether habeas corpus relief

2   is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

3   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

4   reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

5   AEDPA's deferential standard does not apply and a federal habeas court must review the claim

6   de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

7   1167 (9th Cir. 2002).

8   II.  Petitioner's Claims

9        A.  Jury Instruction Error

10          Petitioner raises several claims of jury instruction error.  After setting forth the

11   applicable legal principles, the court will analyze these claims in turn below.

12          1.  Legal Standards

13          A challenge to jury instructions does not generally state a federal constitutional

14   claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

15   U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to

16   warrant federal habeas relief, a challenged jury instruction cannot be merely "undesirable,

17   erroneous, or even universally condemned, but must violate some due process right guaranteed

18   by the Fourteenth Amendment."  Prantil v. State of California, 843 F.2d 314, 317 (9th Cir. 1987)

19   (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)) (internal quotes omitted).  To prevail on

20   such a claim the petitioner must demonstrate that an erroneous instruction "so infected the entire

21   trial that the resulting conviction violates due process."  Prantil, 843 F.2d at 317 (quoting Darnell

22   v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must

23   evaluate the challenged jury instructions "in the context of the overall charge to the jury as a

24   component of the entire trial process."  Id. (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th

25   Cir. 1984)).  Where the challenge is a failure to give an instruction, the petitioner's burden is

26   "especially heavy," because "[a]n omission, or an incomplete instruction is less likely to be

6

1   prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). See

2   also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

3                           2. CALJIC No. 3.31

4          Petitioner claims that the trial court erred when it failed to give the pattern jury

5   instruction regarding the requirement that there be a "union or joint operation of act and intent"

6   and instead told the jury that the act must be "accompanied" by a specific intent. (Pet. at 5.) The

7   California Court of Appeal fairly described the background to this claim as follows:

8          The court instructed the jurors under a modified version of
           CALJIC No. 3.31 as follows:
9
           "For the crime charged the act or conduct must be accompanied by
10         a certain specific intent in the mind of the actor. Unless the
           specific intent exists, the crime is not committed. The specific
11         intent required is explained in a later instruction in which the crime
           is defined."[4]
12
           The standard version of CALJIC No. 3.31 tells the jury that for the
13         crime charged, "there must exist a union or joint operation of act or
           conduct and a certain specific intent in the mind of the
14         perpetrator." The version given by the trial court deleted this
           language and replaced it with language that instructed the jury "the
15         act or conduct must be accompanied by a certain specific intent in
           the mind of the actor."
16
           The trial court also instructed the jurors on the elements of burglary
17         pursuant to CALJIC No. 14.50 which instructs the jury in part that
           to find defendant guilty it must find that "at the time of the entry,
18

19  /////

20  /////

21  /////

22

23         [4]  The pattern CALJIC No. 3.31 states in pertinent part as follows:

24         "In the crime[s]] . . . charged . . ., there must exist a union or joint operation of act
           or conduct and a certain specific intent in the mind of the perpetrator. Unless this
25         specific intent exists the [crime] . . . to which it relates [is not committed] . . . . [¶]
           [The specific intent required is included in the definition[s] of the [crime[s]] . . .
26         set forth elsewhere in these instructions.] . . ."

                                              7

he had the specific intent to steal and take away someone else's property . . . ."[5]

(Opinion at 13-14.)

Petitioner argues that the modified instruction given by the trial court did not accurately instruct the jury on the requisite mental state necessary for burglary; i.e., that the act and the intent must occur at the same time. (Pet. at 5 & Memorandum of Points and Authorities attached thereto (P&A) at 4-8; Traverse at 4-5.) The California Court of Appeal rejected petitioner's argument in this regard, reasoning as follows:

> In sum, the jury was instructed that to find defendant guilty of burglary, they must find he entered a locked vehicle (the act or conduct) and at the time of entry, had the specific intent to steal someone else's property (the intent). The jury was properly informed that it had to find defendant committed the act at the same time he harbored the requisite intent. We therefore conclude the trial court's effort to streamline the pattern instruction, while a potentially perilous endeavor, adequately paraphrased the pattern instruction.

> Nevertheless, defendant fears that because the jury was only required to find the act was "accompanied by" the intent, it could have found he formed the specific intent a split second after entry rather than at the same time. We disagree.

> As defendant points out in his brief, the verb "to accompany" means "to exist or occur in conjunction with." (Webster's 3d New Internat. Dict. (1971) p. 12.) "Conjunction" is defined as "the act of conjoining or state of being conjoined: union." (Id. at p. 480.)

---

[5] The court instructed the jury pursuant to CALJIC No. 1.450 as follows:

"The defendant is accused in the Information of having committed the crime of burglary, a violation of Section 459 of the Penal Code. [¶] Every person who enters a motor vehicle, the doors of which have been locked, with the specific intent to steal, take, and carry away the personal property of another, of any value, and with the further specific intent to deprive the owner of the property permanently is guilty of the crime of burglary, in violation of Penal Code section 459. [¶] Whether the intent with which the entry was made was thereafter carried out is not determinative. [¶] For burglary, each of the following elements must be proved: One, a person entered a motor vehicle, the doors of which had been locked; And, two, at the time of the entry, he had the specific intent to steal and take away someone else's property and to deprive the owner of the property permanently."

1

>Thus, the word "accompany" is synonymous with "union" in certain contexts.  Under the law of burglary, the intent to steal must exist at the time of entry.  (See People v. Kwok (1998) 63 Cal.App.4th 1236, 1246; People v. Hill (1967) 67 Cal.2d 106, 119.)  Because the jury was instructed that it had to find the act or conduct was accompanied by a certain specific intent, and that "*at the time of entry* . . . [defendant[ had the specific intent to steal," we find no error.

2

3

4

5

6  (Opinion at 15-16.)

7          The decision of the state appellate court rejecting petitioner's jury instruction

8  claim is not contrary to or an unreasonable application of the federal due process principles set

9  forth above.  For the reasons described by the state court, the trial court's modification of

10  CALJIC No. 3.31 was an accurate statement of the intent requirement and did not render

11  petitioner's trial fundamentally unfair.  Accordingly, petitioner is not entitled to relief on this

12  claim.

13          3.  CALJIC No. 2.71

14          Petitioner's next claim is that the trial court erred in giving a modified version of

15  CALJIC No. 2.71 (defining an "admission").  (Pet. at 5; P&A at 9-12; Traverse at 6-7.)  The

16  California Court of Appeal rejected this argument, reasoning as follows:

17

>The trial court instructed the jury with the following modified version of CALJIC No. 2.71:

18

19

>"An admission is a statement made by the defendant that does not acknowledge his guilt of the crime but which tends to prove his guilt when considered with the rest of the evidence.

20

21

>"You are the exclusive judges of whether the defendant made an admission, and, if so, of its significance.

22  /////

23  /////

24  /////

25  /////

26  /////

9

"Evidence of an oral accusation (sic) should be viewed with caution."[6]

Defendant argues that because the theory of his defense was to admit guilt to the lesser offense of vehicle tampering, the jury was improperly instructed to "view with caution" his testimony that he broke the window.  He further argues that the court erroneously deleted the language from the standard instruction limiting an admission to statements concerning the crime "for which the defendant is on trial" and to statements by "the defendant not made in court."  He argues that by omitting the language in this way, the court directed the jury to view with caution admissions to the charged offense as well as admissions to the lesser included offense that were beneficial to the defense.  He also claims the modified instruction allowed the jury to apply the view-with-caution directive to the portions of his trial testimony in which he admitted breaking the window.

Similar claims were considered and rejected in People v. Vega (1990) 220 Cal.App.3d 310, 317.  In Vega, the court recognized that a statement may be both exculpatory and incriminatory because it proves guilt of a lesser offense.  However, the court held that juries are capable of determining whether a statement is an admission, which they are instructed to view with caution, or whether it is exculpatory and therefore not an admission, to which the cautionary language does not apply.  The court concluded that the trial court has no sua sponte duty to modify CALJIC No. 2.71 to fit each possible interpretation the jury may give to a defendant's statement.  (Id. at p. 318; see also People v. Senior (1992) 3 Cal.App.4th 765, 777 [statement admitting sex crime but denying use of force or duress]; People v. Livaditus (1992) 2 Cal.4th 759, 783-784.)

Likewise in the present case, the jury was instructed that an admission is a statement that "tends to prove his guilt when considered with the rest of the evidence."  Applying that instruction, the jurors would be able to determine defendant's

---

[6]  The pattern CALJIC No. 2.71 states as follows:

"An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his ] [her] guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part.

"[Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution.]"

1   statement that he deliberately broke the window of the van, but did
    not take anything from it, did not constitute an admission to the
2   charge of burglary, and therefore the view-with-caution directive
    did not apply to those statements.  We presume the jurors
3   understood and followed the court's instruction.  (citations
    omitted.)
4
    Defendant attempts to distinguish Vega, arguing that the
5   instruction in that case was applied to the defendant's extrajudicial
    statements rather than to his testimony, as in the case at bench.  We
6   see no legally significant distinction because in Vega, the
    extrajudicial statements were the sole evidence in support of the
7   defense.  Consequently, the cautionary instruction in Vega, as in
    the present case, was potentially applicable to the only evidence
8   introduced in support of the defense.  Because the jury was
    adequately instructed, we find no error.  (citation omitted.)
9

10  (Opinion at 11-13.)

11          For the reasons explained by the state appellate court, the jury instruction given by

12  the trial court regarding the definition of an "admission" did not render petitioner's trial

13  fundamentally unfair.  The appellate court's conclusion that a rational juror would have been able

14  to distinguish the statements that could properly be viewed with caution and those that should not

15  be viewed with caution is not an unreasonable application of the facts of this case or the pertinent

16  law.  This court also notes that the jury instruction, as given, instructed the jury that evidence of

17  an oral "accusation" should be viewed with caution.  (Reporter's Transcript on Appeal (RT) at

18  405.)  The instruction should have informed the jury that evidence of an oral "admission" should

19  be viewed with caution.  (Clerk's Transcript on Appeal (CT) at 72.)  Because there was no

20  evidence in this case that petitioner ever made an oral "accusation," this portion of the jury

21  instruction could not have caused the jury to view his trial testimony with caution.

22          For all of these reasons, petitioner is not entitled to relief on this claim.

23          4.  CALJIC No. 2.51

24          Petitioner's next claim is that "the trial court gave a modified instruction on

25  motive (CALJIC No. 2.51) which was unbalanced, tilting in favor of the prosecution."  (P&A at

26  12-14.)  The California Court of Appeal fairly described the background to this claim as follows:

11

1    The trial court gave the following modified version of CALJIC No.
     2.51:
2
3        "Motive is not an element of the crime charged; it need not be
         shown.  You may consider motive or lack of motive for whatever
         bearing you may think it has.  Presence of motive may tend to
4        establish guilt; absence of motive may tend to suggest innocence."[7]
         Defendant argues that the trial court's use of the word "suggest"
5        instead of "establish" in the last sentence of the instruction unfairly
         weighted the instruction in favor of the prosecution, because
6        "establish" is a stronger verb than "suggest."

7    (Opinion at 16.)

8        In his claim before this court, petitioner explains that the language of the modified

9    jury instruction was "unbalanced" for the following reason:

10       Rather than use language of equal strength to counterbalance the
         guilt side of the equation, as the pattern instruction does, the
11       modified instruction states that the absence of motive may tend
         merely to "*suggest* innocent (sic)."  Thus, the instruction speaks of
12       a tendency to establish guilt on one side, while on the other side,
         there is merely a suggestion of innocent (sic).
13

14   (P&A at 13.)

15       The state appellate court rejected petitioner's arguments in this regard, reasoning

16   as follows:

17       It is well established that the correctness of jury instructions is to
         be determined from the entire charge rather than from a
18       consideration of parts of an instruction or from a particular
         instruction.  (People v. Wilson (1992) 3 Cal.4th 926, 943.)  In the
19       context of the entire charge, we think defendant's argument places
         too much weight on the word "suggest."
20
         While the challenged instruction used different words relating to
21       the effect of the presence or absence of motive,[8] the modified

22
     _____
23       [7] CALJIC No. 2.51 states as follows:  "Motive is not an element of the crime charged and
     need not be shown.  However, you may consider motive or lack of motive as a circumstance in
24   this case.  Presence of motive may tend to establish the defendant is guilty.  Absence of motive
     may tend to show the defendant is not guilty."
25
         [8] We note that like the trial court's modified instruction, the form instruction uses the
26   word "establish" in connection with the presence of motive, but not in connection with the
     absence of motive.

1   instruction also told the jury it "may consider motive or lack of
2   motive for whatever bearing you may think it has."  Additionally,
    the jury was given the reasonable doubt instruction.  (CALJIC No.
3   2.90.)  In light of these instructions, we think the jury was properly
    instructed on the standard of proof."

4   There was also strong evidence of guilt.  Eyewitness testimony and
    defendant's own statements established that he broke into the van.
5   The discovery of the Slabaughs' daughter's backpack on the street
    where defendant was stopped moments after the burglary support a
6   reasonable inference that he took the backpack from the van after
    breaking into the van.  His flight from the scene and his
7   inconsistent statements demonstrate his consciousness of guilt.  In
    light of the instructions and the strength of the evidence, we
8   conclude defendant's substantial rights were not affected.

9   (Opinion at 17-18.)

10          The decision of the state appellate court rejecting petitioner's jury instruction

11  claim is not contrary to or an unreasonable application of the federal due process principles set

12  forth above.  For the reasons explained by the state court, and considering the record as a whole,

13  the trial court's use of the word "suggest" instead of the word "establish" in the modified jury

14  instruction regarding motive did not render petitioner's trial fundamentally unfair.  Accordingly,

15  petitioner is not entitled to relief on this claim.

16          5.  CALJIC Nos. 1.00 and 17.41.1

17          Petitioner's next claim is that the trial court violated his right to due process when

18  it instructed the jury with modified versions of CALJIC Nos. 1.00 and 17.41.1.

19          The state court record reflects that petitioner's jury was instructed with CALJIC

20  No. 1.00, as follows:

21          You must follow the law as I state it to you.  If at some point you
            find that you cannot do that, you must notify me immediately.  If at
22          any point, even during deliberations, it becomes clear to you that
            you are not able to vote for any verdict which you understand that
23          the law and the evidence require, because of a philosophical
            constraint or a religious scruple or for any other personal reason,
24          you must notify me immediately.

25  (CT at 49-50.)

26  /////

13

1    Petitioner's jury was also instructed with CALJIC No. 17.41.1, as follows:

2    If any juror refuses to deliberate or states an intention to disregard
     the law, or to decide the case based on penalty or punishment or
3    any other improper consideration, the other jurors must
     immediately advise me.
4

5    (Id. at 83.)

6        Petitioner claims that these jury instructions violated his right to an impartial jury

7    and "impermissibly intrude into the secrecy and autonomy of jury deliberations." (Pet. at 5(a).)

8    He also contends that the instructions had a chilling effect on free and open deliberations and

9    required each juror to "act as an informant for the trial judge to report any perceived acts of

10   misconduct committed by any fellow juror." (P&A at 15.)

11       The California Court of Appeal concluded that petitioner had waived this claim

12   on appeal but that any error in giving the two instructions set forth above was harmless in any

13   event. (Opinion at 19.) After the state appellate court issued its decision in this case, the

14   California Supreme Court held that CALJIC 17.41.1 did not infringe upon a defendant's federal

15   or state constitutional right to trial by jury or his state constitutional right to a unanimous jury

16   verdict. People v. Engelman, 28 Cal. 4th 436 (2002). However, exercising its supervisory

17   authority over the lower state courts, the California Supreme Court discontinued use of CALJIC

18   No. 17.41.1 because of its "potential" to intrude on jury deliberations. Id. at 449.

19       Petitioner's claim in this regard is foreclosed by the decision of the Ninth Circuit

20   in Brewer v. Hall, 378 F.3d 952, 955-57 (9th Cir.), cert. denied, 543 U.S. 1037 (2004) in which

21   the court rejected this same claim. See Osumi v. Giurbino, 445 F. Supp. 2d 1152, 1165 (C.D.

22   Cal. 2006) (concluding that the holding in Brewer controls and forecloses a federal habeas claim

23   challenging CALJIC 17.41.1). Accordingly, the state court's rejection of petitioner's claim was

24   not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. §

25   2254(d).

26   /////

14

1    Even if the two challenged instructions were erroneously given, any error in this

2 case was harmless.  See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (federal habeas relief

3 may not be granted for trial errors without a showing of actual prejudice, defined as a

4 "substantial and injurious effect or influence in determining the jury's verdict").  This court

5 agrees with the following analysis of the issue of prejudice by the state appellate court:

> A verdict was reached after the jury deliberated for one hour, with
> no indication of deadlock or holdout jurors.  Nothing in the record
> indicates defendant was prejudiced by the giving of CALJIC Nos.
> 1.00 and 17.41.1.  We will not infer that giving these two
> instructions had any impact prejudicing defendant.  We reject his
> speculation that the instructions had a chilling effect on the jurors'
> deliberation, inhibiting the kind of free expression and interaction
> among jurors that is so important to the deliberative process.
> There is no warrant for that view on this record, and we find any
> error in giving the instruction was harmless beyond a reasonable
> doubt.

12 (Opinion at 20.)

13    This court also notes that petitioner's jurors did not ask any questions or

14 communicate with the court in any way before returning their guilty verdict against petitioner.

15 There is simply no indication that the giving of CALJIC Nos. 17.41.1 and/or 1.00 chilled the

16 jurors' exercise of free speech or prevented free and full deliberations.  Accordingly, petitioner is

17 not entitled to relief on this claim.

18    B.  Juror Misconduct

19    Petitioner claims that the trial court's denial of his motion for new trial based on

20 juror misconduct violated his right to due process.  The California Court of Appeal fairly

21 described the background to this claim as follows:

> In support of the motion for new trial, defendant submitted the
> declaration of his brother, James Douglas, relating a conversation
> he allegedly had with a juror on defendant's jury.  He declared in
> pertinent part as follows:

>> "On or about May 4, 1999, I was standing in the
>> corridor speaking with a friend relative to why I was
>> there at the courthouse building and during that time
>> the following exchange occurred.

> "I related to the friend my presence was caused by
> the trial of Michael Leon Chipman and that he was
> fighting a 25 to life sentence over some trivial
> matter and that I felt he had been set up by the
> police officer who investigated the case, even
> though he was the alleged victim in the matter.  At
> about that time a black woman whom I
> subsequently recognized as a member of the jury
> walked up to me and without prompting proceeded
> to ask me if I felt my brother, Michael Chipman,
> had been 'set up.'  I responded that there was little
> doubt in my mind he was set up by this police
> officer.  I proceeded then to talk some more with my
> friend.  The friend then asked why Michael
> Chipman had been set up, and I told him it was
> 'bullshit' and that anything further was not for him
> to know.

> "While in the courtroom during the morning session
> I did not pay particular attention to the jury box, so I
> did not know at that time the black woman was a
> member of the jury until after they went back into
> the courtroom.

> "Later that day I had a short conversation with
> Shirley Dottson [sic] and it was at that time I told
> her, Shirley Dottson [sic], that I spoke to the black
> juror.

No further evidence was introduced on the matter.  The trial court
denied the motion for new trial stating it "seriously doubt[ed] that
any such conversation ever occurred" because if it had, Miss
Dodson would have made it known to defense counsel right away.
Nevertheless, the court indicated it would assume for present
purposes that the conversation occurred, that the juror engaged in
misconduct by violating the court's order not to discuss the case,
and found there was no showing of prejudice.  The court found
there had been a failure to show lack of impartiality towards
defendant because any possible bias or skepticism on the part of
the juror would have been towards the People rather than towards
defendant.

(Opinion at 6-8.)

Petitioner agrees that the juror's remarks "demonstrated that she had doubts about

the sufficiency of the People's case at trial."  (P&A at 21.)  However, he argues that the trial

court erred when it found a lack of prejudice, explaining as follows:

/////

16

The trial court erred, however, in concluding that the juror's skepticism towards the prosecutor's case meant that the juror's misconduct could not be prejudicial to appellant.  Obviously, the doubts that the juror had prior to contacting Mr. Douglas were dissipated by the time the jury reached its verdict of guilt, which occurred only after an hour of deliberations.  It cannot be said that the conversation with Mr. Douglas was not a factor permitting the juror to resolve her doubts in favor of conviction."

(Id.)

The California Court of Appeal rejected petitioner's claim of juror misconduct, reasoning as follows:

. . . we find no abuse of discretion by the trial court.  First, as the trial court found, it is doubtful the conversation described in his declaration ever took place.  Neither the juror to whom he spoke or Ms. Dodson came forward to corroborate the facts alleged in the declaration and defense counsel did not introduce the declarations of either of these two women.  Thus, defendant's motion was based upon the uncorroborated self-serving declaration of his brother, which the trial court found lacked credibility.  We therefore find the evidence of misconduct is not supported by substantial evidence.  (See People v. Evers (1992) 10 Cal.App.4th 588, 597-59.)

Moreover, even assuming juror misconduct, the conversation operated to defendant's advantage because it disclosed a bias or skepticism against the People's case not against defendant, and therefore the conversation was not injurious to defendant.  Accordingly, we conclude there is no substantial likelihood the juror who allegedly spoke to Mr. Douglas was actually biased against defendant.

Defendant also claims there is a second aspect of prejudice that was overlooked by the trial court.  He argues he was prejudiced because the juror overheard a portion of Douglas's conversation when he referred to the fact appellant was charged under the three strikes law.  We disagree.

The so-called reference to the three strikes law was the alleged statement defendant "was fighting a 25 to life sentence over some trivial matter . . . ."  This statement says nothing about the three strikes law directly.  At most, it is an indirect reference to a sentence required under the three strikes law (see Pen. Code, § 667, subd. (e)(2)(ii)) and no evidence was introduced that the juror heard this statement or understood its significance.  Moreover, defendant admitted that he suffered a prior conviction for burglary, the same crime for which he was being tried, and Ms. Dodson

17

1            made more than one reference in her testimony to the fact
        defendant was on parole.  Thus, the jury was aware that defendant
2            had a felony criminal record.  In light of all the evidence, we find
        no prejudice arose from this alleged statement.
3

4    (Opinion at 9-10.)

5           The Sixth Amendment right to a jury trial "guarantees to the criminally accused a

6    fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).

7    See also Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Green v. White, 232 F.3d 671, 676 (9th Cir.

8    2000).  Due process requires that the defendant be tried by "a jury capable and willing to decide

9    the case solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  See also

10   United States v. Plache, 913 F.2d 1375, 1377-78 (9th Cir. 1990).  Jurors are objectionable if they

11   have formed such deep and strong impressions that they will not listen to testimony with an open

12   mind.  Irvin, 816 U.S. at 722 n.3.  A defendant is denied the right to an impartial jury if even one

13   juror is biased or prejudiced.  Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc);

14   United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979).  Thus, "[t]he presence of a biased

15   juror cannot be harmless; the error requires a new trial without a showing of actual prejudice."

16   United States v. Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting Dyer, 151 F.3d at 973

17   n.2).

18          Courts have analyzed juror bias under two theories, actual bias and implied (or

19   presumed) bias, either of which may support a challenge of a prospective juror for cause.  Fields

20   v. Brown, 503 F.3d 755, 767-68 (9th Cir. 2007).  Actual bias is "'bias in fact' – the existence of a

21   state of mind that leads to an inference that the person will not act with entire impartiality."

22   Gonzalez, 214 F.3d at 1112 (quoting United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997)).

23   Although actual bias is the more common grounds for excusing jurors for cause,  "[i]n

24   extraordinary cases, courts may presume bias based upon the circumstances."  Gonzalez, 214 F.3d

25   at 1112 (quoting Dyer, 151 F.3d at 981).  See also McDonough Power Equipment, Inc. v.

26   Greenwood, 464 U.S. 548, 556-57 (1984) (Blackmun, Stevens and O'Connor, JJ., concurring)

1   (accepting that "in exceptional circumstances, that the facts are such that bias is to be inferred");

2   id at 558 (Brennan and Marshall, JJ, concurring in the judgment) (agreeing that "[t]he bias of a

3   prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively

4   presumed as [a] matter of law") (alterations in original) (quotations omitted); Smith v. Phillips,

5   455 U.S. 209, 221-24 (1982) (O'Connor, J, concurring) ("there are some extreme circumstances

6   that would justify a finding of implied bias"); Clark v. United States, 289 U.S. 1, 11 (1933).

7   Thus, the Ninth Circuit has, in several cases, presumed bias from "the 'potential for substantial

8   emotional involvement, adversely affecting impartiality,' inherent in certain relationships."

9   Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990) (quoting United States v. Allsup, 566 F.2d 68,

10  71 (9th Cir. 1977)).  See also United States v. Nell, 526 F.2d 1223, 1229 n.8 (5th Cir. 1976) (The

11  concept of implied or presumed bias arises from "situations in which the circumstances point so

12  sharply to bias in a particular juror that even his own denials must be discounted.").  Implied bias

13  is bias conclusively presumed as a matter of law.  United States v. Wood, 299 U.S. 123, 133

14  (1936);  United States v. Greer, 285 F.3d 158, 171 (2d Cir. 2000) (citing Torres, 128 F.3d at 45).

15  On collateral review, a petitioner must show that the alleged error " 'had substantial and injurious

16  effect or influence in determining the jury's verdict.'"  Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th

17  Cir. 1993) (quoting Brecht, 507 U.S. at 637).

18          This court agrees with the California Court of Appeal that juror bias did not

19  render petitioner's trial fundamentally unfair.  Even assuming that the conversation related by

20  petitioner's brother took place, there is no evidence that the juror in question harbored any bias

21  against petitioner, either actual or implied.  Nor is there any indication that the juror in question

22  was unable to decide petitioner's case based on the evidence introduced at trial.  Put another way,

23  there is no evidence that the presence of the juror on petitioner's jury prejudiced petitioner to the

24  extent that he did not receive a fair trial.  See Brown v. Ornoski, 503 F.3d 1006, 1018 (9th Cir.

25  2007) (finding not objectively unreasonable the state court's rejection of a claim based upon the

26  /////

19

1  allegation that four jurors had overheard petitioner's family and friends conversing about the

2  case).  Accordingly, petitioner's claim regarding juror bias should be denied.

3          C.  Three Strikes Law

4                  Petitioner raises three claims challenging California's Three Strikes Law.[9]  In his

5  claim six, petitioner argues that the Three Strikes Law is applied unfairly by California

6  prosecutors, in violation of the Eighth Amendment, the separation of powers doctrine and the

7  Equal Protection and Due Process Clauses.  (Pet. at 5(a).)  In his seventh claim, petitioner argues

8  that the Three Strikes Law violates the Ex Post Facto Clause.  (Id. at 5(b).  In his claim eight,

9  petitioner contends that the Three Strikes Law constitutes an unlawful Bill of Attainder.  (Id.)

10  The court will evaluate these claims in turn below.

11          1.  Unequal Application of Three Strikes Law

12                  Petitioner claims that prosecutors in California apply the Three Strikes Law

13  unequally to criminal defendants, in violation of the Eighth Amendment, the separation of

14  powers doctrine and the Due Process and Equal Protection Clauses.  (Pet. at 5(a).)  Specifically,

15  petitioner alleges that:

16              prosecutors in this state have circumvented the Legislative intent of
            the law and has (sic) engaged in the unauthorized and illegal
17          practice of plea bargaining (See Ca. Pen. Code § 667(g)), and as of
            January 2001, through Los Angeles County District Attorney
18          Office policy, have decided to further disregard the mandatory
            language and stop bringing prior convictions (Strikes) to be plead
19          and proven (See Ca. Pen. Code § 667 (f)), to some defendants
            advantage, due to coercive plea bargaining.

20

21  /////

22  _____

23          [9]  California's "Three Strikes" law, which appears in California Penal Code § 667(b)(I),
    was enacted by the California Legislature and became effective March 7, 1994.  The statute
24  prescribes increased terms of imprisonment for defendants who have previously been convicted
    of certain "violent" or "serious" felonies.  See Cal. Penal Code § 667(d).  A second strike
25  defendant (with one prior felony conviction) receives "twice the term otherwise provided as
    punishment for the current felony conviction."  Cal. Penal Code § 667(e)(1).  A third strike
26  defendant (with two or more prior felony convictions) receives an indeterminate term of life
    imprisonment, which includes a minimum term.

(P&A at 22.)  In the traverse, petitioner alleges that "the prosecutors of California are illegally plea bargaining in violation of equal protection and in violation of separation of powers doctrine, making petitioner's sentence cruel and unusual punishment."  (Traverse at 22.)  In essence, petitioner is arguing that the Three Strikes Law violates the federal constitution because it gives prosecutors unbridled discretion to determine whether a particular defendant will be charged under that law.  (P&A at 22-26.)

The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  "'[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" Oyler v. Boles, 368 U.S. 448, 456 (1962).  The Supreme Court requires "exceptionally clear proof" before inferring an abuse of prosecutorial discretion.  McCleskey v. Kemp, 481 U.S. 279, 297 (1987).  "Ordinarily, [courts] presume that public officials have properly discharged their official duties." Banks v. Dretke, 540 U.S. 668, 696 (2004) (citations omitted).  Where a defendant contends that a prosecutor made a charging decision in violation of the Constitution, the defendant's "standard [of proof] is a demanding one." United States v. Armstrong, 517 U.S. 456, 463 (1996).  See also United States v. Washington, 109 F.3d 335, 338 (7th Cir. 1997) (three-strikes provision of 18 U.S.C. § 3559(c) did not violate separation of powers principles by giving prosecutor "too much power").  "There must be an allegation of invidiousness or illegitimacy in the statutory scheme before a cognizable [equal protection] claim arises." McQueary v. Blodgett, 924 F.2d 829, 835 (9th Cir. 1991).  Federal courts employ a strong presumption that governmental classifications do not violate the Equal Protection Clause unless they burden a suspect class or a fundamental interest.  City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976).

21

1    Plaintiff has failed to demonstrate that other defendants, similarly situated to him,

2   were systematically treated better than he.  Nor has petitioner shown that there is no rational

3   basis for the distinction drawn by California's Three Strikes Law.  The state's interest in

4   punishing recidivist more harshly to advance the legitimate goal of public safety provides a

5   rational basis for the statute and thus avoid violation of the Equal Protection Clause.  See

6   Rummel v. Estelle, 445 U.S. 263, 276 (1980); McQueary, 924 F.2d at 834-35; Kalka v.Vasquez,

7   867 F.2d 546, 547 (9th Cir. 1989).  Petitioner has also failed to meet his burden of demonstrating

8   that prosecutors in California have abused their discretion when deciding whom to charge under

9   the Three Strikes Law.  There is no evidence that prosecutors have made their charging decisions

10   based on unjustifiable factors such as race, religion, or other arbitrary classification.  The record

11   does not support the notion that the prosecutor violated the law or applied an improper

12   classification in charging petitioner under the Three Strikes Law.  Therefore, petitioner did not

13   receive unequal or unfair treatment based on the varying implementation policies of the district

14   attorneys throughout the state of California.  See McQueary, 924 F.2d at 835 (in order to

15   demonstrate that a sentencing statute violates the Equal Protection Clause, a petitioner must state

16   a claim that the statute is unevenly applicable to criminal defendants or is unevenly applied to the

17   petitioner); United States v. Kaluna, 192 F.3d 1188, 1199 (9th Cir. 1999) (contention that the

18   federal "three strikes" statute, 18 U.S.C. § 3559(c)(1), violates the fundamental constitutional

19   principle of separation of powers because it impermissibly increases the discretionary power of

20   prosecutors while stripping the judiciary of all discretion to craft sentences presents "no

21   constitutional question"); United States v. Wicks, 132 F.3d 383 (7th Cir. 1997) (use of

22   prosecutorial discretion in applying federal "three strikes" law did not violate separation of

23   powers doctrine or equal protection).

24    Moreover, it is well-established that criminal defendants have no constitutional

25   right to a plea bargain.  Weatherford v. Bursey, 429 U.S. 545, 561 (1977); King v. Brown, 8 F.3d

26   1403, 1408 (9th Cir. 1993); United States v. Anderson, 993 F.2d 1435, 1439 (9th Cir. 1993); see

22

1   also Cal. Penal Code § 1192.5 (providing for court's withdrawal of its approval of a plea prior to

2   sentencing with the defendant being given the opportunity to then withdraw plea).  Accordingly,

3   to the extent petitioner is arguing he should have been offered a plea bargain, his claim should be

4   rejected.  Finally, this court notes that the Supreme Court has "repeatedly upheld recidivism

5   statutes against contentions that they violate constitutional strictures dealing with double

6   jeopardy, ex post facto laws, cruel and unusual punishment, due process, equal protection, and

7   privileges and immunities."  Parke v. Raley, 506 U.S. 20, 27 (1992).

8           For all of the above-described reasons, petitioner is not entitled to relief on his

9   claim that California's Three Strikes Law violates the federal constitution.

10              2.  Ex Post Facto Clause

11          Petitioner also argues that California's Three Strikes Law violates the proscription

12   against ex post facto laws.  (P&A at 29-32.)

13          The application of a sentencing enhancement based upon a prior conviction does

14   not violate the Ex Post Facto Clause as long as the statute was in effect before the triggering

15   offense was committed.  See Kaluna, 192 F.3d at 1199 ("The Supreme Court and this court

16   uniformly have held that recidivist statutes do not violate the Ex Post Facto Clause if they are "on

17   the books at the time the [present] offense was committed") (quoting United States v.

18   Ahumada-Avalos, 875 F.2d 681, 683-84 (9th Cir. 1989)); Witte v. United States, 515 U.S. 389,

19   399 (1995) (recidivist statutes do not violate double jeopardy because the enhanced punishment

20   imposed for the later offense is not viewed as either a new jeopardy or an additional penalty for

21   the earlier crimes, but is instead a stiffened penalty for the latest crime, which is considered to be

22   an aggravated offense because it is a repeat offense).

23          California's Three Strikes law took effect on March 7, 1998, before petitioner

24   committed the principal offense on October 6, 1998.  Accordingly, there was no violation of the

25   /////

26   /////

23

1 federal Ex Post Facto Clause by virtue of the sentence imposed in petitioner's case.[10]

2 Accordingly, petitioner is not entitled to relief on this claim.

3        3.  Bill of Attainder

4       Next, petitioner contends that his sentence violates the prohibition against a bill of

5 attainder.  A bill of attainder involves a statute imposing punishment without the benefit of trial.

6 Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 468 (1977).  Three requirements must be

7 met to establish a violation of the Bill of Attainder Clause: it must single out an identifiable

8 group, inflict punishment, and dispense with a judicial trial.  Id.; Selective Serv. Sys. v.

9 Minnesota Pub. Interest Research Group, 468 U.S. 841, 846-47 (1984).

10       Petitioner's sentence does not qualify as a bill of attainder.  California's Three

11 Strikes Law does not dispense with a judicial trial.  Petitioner was entitled to and did receive a

12 jury trial on his underlying prior convictions.  In addition, in order to be counted as a strike, prior

13 convictions must be found by a jury, or by the court if the criminal defendant waives jury trial on

14 the priors.  See Cal. Penal Code §§ 667 (c), (f) & (g) (requiring that all prior felony convictions

15 be pled and proved), 1170.1(e) ("All enhancements shall be alleged in the accusatory pleading

16 and either admitted by the defendant in open court or found to be true by the trier of fact.").

17 Here, petitioner waived his right to a jury trial on his prior convictions, and submitted the issue

18 of his prior convictions to the trial judge.  Accordingly, petitioner is not entitled to relief on his

19 claim that California's Three Strikes Law is an unlawful bill of attainder.  Cf. Jackson v. Nelson,

20 435 F.2d 553 (9th Cir. 1971) (summarily rejecting a bill of attainder claim in the context of a

21 pre-Three Strikes recidivist sentencing case).

22 /////

23 /////

24

25    [10] California courts also have consistently held that enhancement for prior serious felony convictions does not violate the prohibition against ex post facto laws.  See People v. James, 91

26 Cal. App. 4th 1147, 1151 (2001); People v. Williams, 140 Cal. App. 3d 445, 448-49 (1983) (citing Ex Parte Gutierrez, 45 Cal. 429, 432 (1873)).

1          4.  Cruel and Unusual Punishment

2          Finally, petitioner may also be claiming that the length of his sentence violates the

3   Eighth Amendment.   Any such claim lacks merit and should be denied.

4          Successful challenges in federal court to the proportionality of particular sentences

5   are "exceedingly rare."  Solem v. Helm, 463 U.S. 277, 289-90 (1983).  See also Ramirez v.

6   Castro, 365 F.3d 755, 775 (9th Cir. 2004).  "The Eighth Amendment does not require strict

7   proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are

8   'grossly disproportionate' to the crime."  Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)

9   (Kennedy, J., concuring).  Thus, in a case of a petitioner convicted of petty theft of $150.00

10  worth of videotapes with prior convictions, the United States Supreme Court has held that it was

11  not an unreasonable application of clearly established federal law for the California Court of

12  Appeal to affirm a sentence of two consecutive 25 year to life imprisonment terms.  Lockyer v.

13  Andrade, 538 U.S. 63, 75 (2003); see also Ewing v. California, 538 U.S. 11, 29 (2003) (holding

14  that a sentence of 25 years to life in prison imposed on a grand theft conviction involving the

15  theft of three golf clubs from a pro shop was not grossly disproportionate and did not violate the

16  Eighth Amendment).

17         Moreover, because petitioner was sentenced as a recidivist under California's

18  Three Strikes law, "in weighing the gravity" of his offense for purposes of a proportionality

19  analysis, the court "must place on the scales not only his current felony," but also his criminal

20  history.  Ewing, 538 U.S. at 29.  See also Ramirez, 365 F.3d at 768.  This is not a case in which

21  the petitioner's criminal history is comprised solely of non-violent offenses stemming from a

22  single, dated incident and single guilty plea resulting in the imposition of only a one-year jail (as

23  opposed to prison) sentence.  See id. at 768-69.  Rather, petitioner had suffered three prior

24  serious felony convictions for first degree residential burglary each of which resulted in petitioner

25  serving prison terms.

26  /////

25

1    Although harsh, petitioner's sentence is not inconsistent with federal law as set

2    forth in the decisions of the United States Supreme Court noted above.  The sentence imposed

3    was within the statutory maximum for the offense committed by petitioner and was not grossly

4    disproportionate to the crime of conviction in light of his criminal history.  See Andrade, 538

5    U.S. at 77; Rios v. Garcia, 390 F.3d 1082, 1086 (9th Cir. 2004).  Accordingly, petitioner is not

6    entitled to relief on his challenge to his sentence on Eighth Amendment grounds.

7        D.  Cumulative Error

8        Petitioner claims that the cumulative effect of the jury instruction errors and juror

9    misconduct, described above, violated his rights to an "unbiased jury," due process and equal

10   protection of the law.  (Pet. at 5(b); P&A at 38-39.)

11       The Ninth Circuit has concluded that under clearly established United States

12   Supreme Court precedent the combined effect of multiple trial errors may give rise to a due

13   process violation if it renders a trial fundamentally unfair, even where each error considered

14   individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007)

15   (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) and Chambers v. Mississippi, 410

16   U.S. 284, 290 (1973)).  "The fundamental question in determining whether the combined effect

17   of trial errors violated a defendant's due process rights is whether the errors rendered the criminal

18   defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and

19   injurious effect or influence' on the jury's verdict."  Parle, 505 F.3d at 927 (quoting Brecht, 507

20   U.S. at 637).

21       This court has addressed each of petitioner's claims of error and has concluded

22   that no error of constitutional magnitude occurred at his trial in state court.  This court also

23   concludes that the alleged errors, even when considered together, did not render petitioner's

24   defense "far less persuasive," nor did they have a "substantial and injurious effect or influence on

25   the jury's verdict."  Accordingly, petitioner is not entitled to relief on his claim of cumulative

26   error.

1                                      CONCLUSION

2              For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

3    application for a writ of habeas corpus be denied.

4              These findings and recommendations are submitted to the United States District

5    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

6    days after being served with these findings and recommendations, any party may file written

7    objections with the court and serve a copy on all parties.  Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

9    shall be served and filed within ten days after service of the objections.  The parties are advised

10   that failure to file objections within the specified time may waive the right to appeal the District

11   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12   DATED: January 23, 2008.

13

14                                  _____

15                                  DALE A. DROZD
                                    UNITED STATES MAGISTRATE JUDGE
16   DAD:8
     chipman712.hc
17

18

19

20

21

22

23

24

25

26

                                            27